THOMAS E. STUTSON and Others, Copartners Trading under the Firm Name and Style of LOUIS WOLF & CO., Respondents, v. ATCHISON, TOPEKA AND SANTA FE RAILROAD COMPANY, Appellant.

First Department, July 2, 1920.

Carriers — suit to recover damages for delay in transporting goods — trial — variance between pleading and proof — failure of carrier to deliver goods because of defective marking — evidence not justifying recovery — opinion of witness as to proper method of transportation.

Action against a common carrier to recover damages alleged to have been caused by its delay in transporting certain merchandise from San Francisco to Boston. The bill of lading specified the route by which the goods were to be shipped and it was understood that the goods, which were silk flags, were to go by expedited freight service which the defendant maintained for such goods, and for which it charged a special rate. Although in the complaint the plaintiff claimed a special contract for the delivery for a particular market, no such agreement was established at trial, and the only claim is that the expedited service agreed to by the defendant was not fulfilled, so that it became liable for a loss occasioned

by a drop in the market for such goods between the time when they should have arrived and the date of the arrival. It appeared that the goods left San Francisco on August twenty-fourth and were not delivered in Boston until October first, although by reasonable dispatch they should have been received on September first, but it further appeared by the testimony of witnesses that upon arrival at Boston the only legible mark on the cases containing said goods was the name of said city, and that the name of the consignee did not appear, and that there were no other markings which identified the goods. On all the evidence,

*Held*, that the plaintiffs failed to establish by a preponderance of the evidence that the defendant did not transport the goods in question with reasonable dispatch, and that a finding to the contrary by the trial court must be reversed as against the weight of evidence.

Moreover, the plaintiffs having failed to establish a liability on special contract as set forth in the complaint and having only proved a contract of carriage under a standard bill of lading, they were not entitled to recover upon the ground that the defendant did not transport the goods with reasonable dispatch, where exception to such theory of liability was taken by the defendant at trial and there was no motion to amend the complaint. Such variance between pleading and proof requires a reversal of judgment for the plaintiffs.

Where the contract of carriage was evidenced by a bill of lading, it was error to allow a witness for the plaintiffs to give his opinion as to how the goods should have been transported.

APPEAL by the defendant, Atchison, Topeka and Santa Fe Railroad Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 27th day of June, 1919, upon the verdict of a jury, and also from an order, as resettled, entered in said clerk's office on the 23d day of July, 1919, denying the defendant's motion for a new trial made upon the minutes.

*Charles M. Sheafe, Jr.*, of counsel [*A. S. H. Bristow*, attorney], for the appellant.

*Arthur B. Hyman* of counsel [*Paskus, Gordon & Hyman*, attorneys], for the respondents.

DOWLING, J.:

The complaint herein sets forth that the plaintiffs, who were copartners, through their agents, W. J. Byrnes & Co., on August 23, 1917, at San Francisco in the State of California,

delivered to the defendant, a common carrier, twenty-three chests of silk flags for transportation therefrom and to be delivered to the plaintiffs at Boston, Mass., which chests defendant thereupon received in its custody as a common carrier of merchandise for hire and thereupon agreed safely, promptly and expeditiously to transport and safely, promptly and expeditiously to deliver as aforesaid. It is further alleged:

" *Fifth.* That at the time of the delivery of the said twenty-three chests of silk flags to the defendant for transportation, carriage and delivery as aforesaid, the defendant was duly notified that the said shipment was intended for a particular market and was to be promptly and expeditiously transported so as to arrive at its destination at a particular time and the defendant thereupon promised and agreed so to transport the said merchandise in baggage cars on what is known as " Silk Trains " and in consideration of the said special promise on the part of this defendant so to transport the said merchandise, the shipper agreed to pay and thereafter did pay to the said defendant extra compensation.

" *Sixth.* That the said merchandise was not delivered to the plaintiffs expeditiously and promptly and on time for the particular market pursuant to the said agreement but on the contrary the delivery of the said merchandise was unduly delayed and the said merchandise was not delivered to the plaintiff at the point of destination in time for the market for which the said merchandise was shipped as aforesaid."

It is then set forth that by reason of the delay and the failure of the defendant to deliver the merchandise as aforesaid plaintiffs have been damaged in the sum of $3,353.65 with interest thereon from August 23, 1917.

The answer of the defendant admits that on or about August 24, 1917, at San Francisco there was delivered to it a certain shipment of twenty-three chests said to contain silk flags, which shipment the defendant as an interstate common carrier then and there accepted and received under and pursuant to all the terms and conditions of its uniform bill of lading, copy of which is attached to the answer and made a part thereof, and that said uniform bill of lading and all the terms and conditions thereof were contained in and formed a part of defendant's freight tariffs and classifications

which were on file with the Interstate Commerce Commission according to law on or about August 24, 1917.

Upon the trial the following facts appeared: Baer, one of the plaintiffs, and Twyefort, an assistant buyer in the plaintiffs' employ, while in Japan purchased a quantity of silk flags and silk bows which were put on cards and packed in twenty-three fibre chests or trunks, and then carried as baggage by Baer and Twyefort on the steamer *Siberia Maru*, which arrived in San Francisco about eight-thirty A. M. on August 24, 1917. On his arrival Baer telephoned to W. J. Byrnes & Co., who attended to the plaintiffs' forwarding business at San Francisco, and William J. Byrnes of that firm sent his representative, Bainbridge, to the dock where the chests were examined, the duty was paid and the chests were delivered to the defendant. The bill of lading for these goods is dated August 24, 1917, and describes twenty-three chests of silk flags, ten of which were marked " Arthur D. Twyefort " and thirteen marked " Julius I. Baer," appropriate numbers appearing opposite each enumerated and numbered chest. The estimated weight was 6,000 pounds, and the rate being four dollars per 100 pounds, the charges were $240. The goods were consigned to Louis Wolf & Co., Boston, Mass., and the route was given as " Santa Fe Albq At S F c/o Star Union Line Car No. 1679." The meaning of these abbreviations is Albuquerque, Atchison, Topeka and Santa Fe railroad and Pennsylvania railroad, the words " Star Union Line," as the testimony shows, describing through freight on the Pennsylvania railroad. The bill of lading is signed by Bainbridge and by defendant's agent. Under the designation contained therein it was the understanding of the plaintiffs' forwarding agent that the goods would go over the defendant's road, then over the Pennsylvania railroad and so move from the Pennsylvania Terminal in New Jersey to Boston, Mass., over the New York, New Haven and Hartford railroad, and for the latter distance it would travel by freight under rule 20 of the tariff. The bill of lading contains the following provision as part of section 3 thereof:

" Sec. 3. No carrier is bound to transport said property by any particular train or vessel, or in time for any particular market or otherwise than with reasonable dispatch, unless

by specific agreement indorsed hereon.   Every carrier shall have the right in case of physical necessity to forward said property by any railroad or route between the point of shipment and the point of destination; but if such diversion shall be from a rail to a water route the liability of the carrier shall be the same as though the entire carriage were by rail.

" The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading, unless a lower value has been represented in writing by the shipper or has been agreed upon or is determined by the classification or tariffs upon which the rate is based, in any of which events such lower value shall be the maximum amount to govern such computation, whether or not such loss or damage occurs from negligence.

" Claims for loss, damage, or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed.   Unless claims are so made the carrier shall not be liable."

Byrnes, plaintiffs' forwarding agent at San Francisco, so far as he remembers, told no one to give any instructions for routing these goods, and gave no such instructions himself. If he had wanted any particular route followed he could have designated it.   Bainbridge, a clerk in his office, prepared the bill of lading there and delivered it to a dockman, who in turn delivered the merchandise with the bill of lading to defendant.   It had no designated route therein at that time. Byrnes received the bill of lading at his office from Bainbridge and it then contained the designation of a route, inserted by defendant.   Byrnes testified that the routing made, involving a transfer at New York, was not unreasonable or unusual for the shipment of this shipment and plaintiffs' attorney said: " We none of us think that."   So that the routing is neither attacked nor open to attack, and plaintiffs' rights must depend upon the bill of lading accepted without question by plaintiffs' representatives and including the route named therein.

These goods were to be transported by the defendant's
silk train, which is an expedited freight service on silk from the
Orient to the eastern seaboard, for which a special rate has
been incorporated in the tariff by defendant at four dollars
per 100 pounds.   In this silk train the silk is shipped in the
baggage cars of an express train, unless there are enough of
such cars to make up a special train, when it is run upon a
passenger schedule.   It is testified by the witness Byrnes that
the usual time of transportation under these conditions between
San Francisco and New York is five to five and one-half or
six days, the average time being five and one-half days.

Upon the trial the plaintiffs abandoned any effort to prove
a special contract for delivery for any particular market and
stood upon the proposition that, there being a contract for
expedited service by a special train and the delivery being
delayed, the defendant was liable for the loss occasioned by a
drop in the general market for silk flags between the time
when they should have arrived and the date of the arrival
of the goods.   These twenty-three chests presumably left
San Francisco on August twenty-fourth, although they may
have left on August twenty-fifth.   They were not delivered
to the plaintiffs in Boston until October first, although it is
claimed that by the use of reasonable dispatch they should
have been received there on September first or September
second.   The bill of lading contains no statement of the value
of the goods at the time of their delivery, and although it was
admitted that the plaintiffs were in possession of the invoices
received in Japan which would have shown the cost of the
goods to them, and although the witness Baer, one of the
plaintiffs, admitted that such invoices were under his control,
they were not produced nor did the plaintiffs make any attempt
to prove the value of the goods at the time of their delivery
to the defendant.   The plaintiffs' recovery was based upon
the theory that they were entitled to the difference between
the market value of the goods on the date when they should
have reached Boston, if forwarded with reasonable dispatch,
and the day when they actually arrived there, and they
introduced proof tending to show that the value of these
goods on the former date was $6,700, and on the latter date
$3,000.   Their claim as made to the New Haven railroad was

for a fifty per cent loss on account of delay, amounting to $3,353.65. The jury awarded the plaintiffs $2,226.66.

For the defendant proof was introduced giving a detailed account of the movement of these goods from the time of their delivery at New York. There is no claim that the defendant in any way departed from the routing shown by the bill of lading, nor does there appear to be any proof of any lack of reasonable dispatch in the handling of the goods up to the time of their arrival at New York. The goods arrived at pier 29, New York, at nine-fifty A. M., on September 1, 1917, in baggage car No. 1679, which is the one in which they left San Francisco. They were on float No. 164, which had been towed from Jersey City to the pier. This was on a Saturday, and a witness, the chief delivery clerk at the dock, testified that it was necessary to place insurance to protect the silk while it was on the pier and that, therefore, the goods were returned unopened to the pier at Jersey City; Monday being a holiday, the shipment could not be returned from Jersey City to New York until September fourth, that it might receive proper protection by insurance in the meantime. This was the customary procedure. The goods were returned again to pier 29, New York, at eleven-fifty-five A. M., on Tuesday, September fourth. The car containing these goods in question was checked out at two-thirty P. M., on September fourth. It was marked New York, New Haven and Hartford Railroad Company, which was the proper routing. On September fifth the chief delivery clerk, Williams, at pier 28 received instructions to load these chests for Boston and he says at that time the only legible mark on the cases was Boston, Mass. The transfer point for the Boston connection was at Waverly transfer, whence it would be loaded for the Harlem River transfer. The chests arrived at Waverly transfer at twelve-forty-five P. M., on September 6, 1917, and were there transferred to a car to be taken to Boston. At six P. M. on September sixth the car containing these chests was taken out at the transfer point at Waverly and moved from Waverly to Greenville, arriving there at four P. M. on September seventh. The chests were delivered to the New Haven railroad at nine A. M. on September eighth. The goods arrived at Oak Point at twelve-forty-five P. M. on Septem-

ber eighth and the chests were checked out at Boston on September eleventh at one-thirty A. M.

The witness Corbett, who checked the goods out, said that they looked to him like drummers' sample trunks; there was no mark on them; no tag or anything; so they simply checked them out and left them on the freight house floor. On cross-examination this witness said they had no mark of " Louis Wolf & Co., Boston, " or any other marking that he could see. He did not see the name Arthur D. Twyefort or Julius I. Baer in any place on the chests nor did he ever see a waybill for these goods. Defendant's witness Riley said there were no marks indicating the consignee in Boston when the goods arrived. Defendant's witness Higgins testified that one McKnight, a salesman or shipper for plaintiffs, came inquiring for the goods, describing their general appearance; that he identified them, whereupon they were delivered to plaintiffs. The witness Sullivan testified that no inquiries had been made for these goods before McKnight's visit. There was testimony from Elmhurst, assistant terminal train master, that at the time this car was being transported, the United States government was in control of the railroads and priority orders had been issued, under which supplies for Europe were moved through the Metropolitan zone as expeditiously as possible and that about ninety per cent of the business was government freight. This witness testified that the car was moved in its regular turn with other freight of like character, and he considered it was getting what he calls " a very good movement." Despite the direct evidence offered by defendant as to the absence of marks, tags or names of the consignee on the chests when they arrived in Boston, no testimony as to the condition of the chests was offered by plaintiffs either on their case in chief or in rebuttal; nor was the testimony as to priority orders given by the government controverted, or any effort made to show specific lack of dispatch between Jersey City and Boston.

Baer was asked the following questions and gave the replies indicated, referring to the flags and bows in suit: " Q. What was done with them after you bought them? A. They were assembled, put on cards and I personally saw that they were packed in the chests. Q. Were they in the

chests when you finally got them in Boston? A. They were, yes, sir, at the Custom House. By the Court: Q. And in the same chests in which you saw them packed in the Orient? A. Yes, sir. By Mr. Hyman: Q. When did they reach Boston? A. The 1st of October. By Mr. Sheafe: Q. Does the witness know that? A. Yes, I was in Boston. Q. Reached Boston; is that what you mean? A. We took possession immediately. * * * By Mr. Hyman: Q. When did you get them? A. The 1st of October. Q. Did you receive any notice of their arrival? A. We did. Q. Did you get them immediately? A. Yes, sir."

The witness was cross-examined by defendant's counsel as to how the chests were marked when they were put on the steamer and described their condition: " Re-cross examination by Mr. Sheafe: Q. Mr. Baer, one further question. How were these packages marked that you saw put on the steamer; marked according to the bill of lading? A. In order to get the packages on the steamer there were two passengers and we arranged with the Steamship Company that we allow each one of the passengers to take one-half of the trunks, so they were marked personally ' J. I. Baer ' and on each end there was a tag and on it ' Louis Wolf & Company, Boston.' Q. Who is Arthur D. Twyefort? A. He was one of our buyers, assistant buyer. Q. In Japan? A. In Japan; yes, sir. Q. Some of them were marked in his name? A. Yes; because he came on the steamer with me. Q. And some were marked Julius I. Baer? A. And a tag on each end, ' Louis Wolf & Company, Boston.' Those were stickers that were put on. Q. These were stickers? A. Yes, and the other were tags."

But there was no effort made to elicit from him the condition of the chests when they were delivered to plaintiffs in Boston, as to marks and tags, although he was there when they arrived and identified the chests as being the same in which they were shipped from the Orient. The only witness called in rebuttal by plaintiffs was one of their employees, Mills, who identified certain numbers appearing on the trunks, and was not interrogated as to other marks or tags thereon or as to the name of any consignee being present thereon. McKnight was not called to testify how he came to locate the chests

and what their condition was when he saw them in the freight house of the New York, New Haven and Hartford railroad before their delivery to plaintiffs.

In my opinion upon this record plaintiffs have failed to establish by a preponderance of evidence that defendant did not transport the goods in question with reasonable dispatch, and the finding to the contrary must be reversed as against the weight of the evidence.  Moreover, plaintiffs did not recover upon the theory of liability set forth in their complaint, which was a special contract for shipment for a particular market, and prompt and expeditious transportation so that it would arrive at a particular time, for all of which plaintiffs paid extra compensation.  No effort was made to produce a contract, and the only contract proven was the standard bill of lading, which contained no such provisions. Objection and exception were duly taken by defendant upon the ground that the theory of liability pleaded had been abandoned, and recovery has been sought upon an entirely new theory, which was, not the breach of any special contract but of the usual and standard contract to deliver with reasonable dispatch.  No motion to amend the complaint was ever made and all defendant's rights have been preserved by exception.  The variance between the pleading and the proof would also require the reversal of the judgment.

Error was committed in allowing plaintiffs' witness Byrnes to answer the question, " What is the usual method for silk to be transported to Boston," to which he replied: " Well, I should say it ought to have been transported through Albany in connection with the New York Central lines, and the B. & A."   There was a contract between the parties, evidenced by the bill of lading, and as has been stated that concededly required transportation over the Pennsylvania railroad to the terminal at New Jersey and thence to Boston via the New York, New Haven and Hartford railroad.  The opinion of the witness as to how the goods should have been transported was of no probative value whatever, and simply imported a new element of confusion as to the real contract.

I have not discussed the rule of damage laid down by the learned trial court, nor the effect of the decisions of this court in *Grossman Mfg. Co., Inc., v. N. Y. C. R. R. Co.*

(181 App. Div. 764) and *American Locomotive Co.* v. *N. Y. C. R. R. Co.* (190 id. 372) for the reason that the question of the measure of damage is not raised by any appropriate exception and motion or request to charge contained in the record.

The judgment and order appealed from will be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., LAUGHLIN, PAGE and MERRELL, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.